# EXHIBIT 1

Ex 1, Pg. 4



RALEIGH • DURHAM • FAYETTEVILLE

# Legislation could mean online sales tax

Posted: 6:32 p.m. Monday
Updated: 7:10 p.m. Monday

Analysts figure that nationwide, states are losing about $23 billion a year in uncollected sales taxes on Internet purchases.

A bill in Congress called the Main Street Fairness Act could change that.

The bill, introduced in the U.S. House of Representatives last month by Massachusetts Democrat Rep. Bill Delahunt, would help states retrieve lost revenue that goes uncollected because of complex, outdated sales tax rules across the country.

The legislation provides congressional authority for the states to simplify and streamline their sales tax systems.

To date, 24 states have entered into the interstate compact, which contains a uniform set of guidelines. The bill does not compel any state to join, but those that choose to adopt the system would then have the authority to require online retailers to collect and remit sales taxes the same way that local businesses do.

Supporters of the bill say it is an issue of fairness and competition and it will help ensure that online retailers are playing by the same rules as local retailers.

Gov. Bev Perdue supports the effort to tax all online purchases. She believes a successful solution has to come from the federal level.

"It's kind of like immigration reform," she said. "You can't have 50 different systems, which is where the states are headed now. You've got to have a national system."

Currently, locally owned stores like Quail Ridge Books in Raleigh have to charge a sales tax. Online competitors, like Amazon.com, only have to charge sales tax if a purchase is made in a state where they have a physical presence.

In other states, residents are supposed to self-report online purchases when filing their tax returns. But many consumers do not.

Ex 1, Pg. 5

In North Carolina, for example, for the 2008 tax year, 109,003 tax returns were filed that reported online purchases. The total amount was $5 million.

"I did not ever think there'd be an unlevel playing field like this," said Quail Ridge owner Nancy Olson said.

She believes the online retailers work off an unfair business model. One she says is causing many local businesses to go under.

"Amazon is even hurting the chain stores," Olson said. "Some of them are ready to go down."

Reporter: Bruce Mildwurf
Photographer: Tom Normanly

*Copyright 2010 by Capitol Broadcasting Company. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

Ex 1, Pg. 6

# EXHIBIT 2



820 First Street NE, Suite 510
Washington, DC 20002

Tel: 202-408-1080
Fax: 202-408-1056

center@cbpp.org
www.cbpp.org

November 16, 2009

# AMAZON'S ARGUMENTS AGAINST COLLECTING SALES TAXES DO NOT WITHSTAND SCRUTINY

By Michael Mazerov

## Summary

The Internet retailer Amazon.com has offered two primary justifications for opposing efforts of a growing number of states to require the company and other online retailers to charge sales tax. Amazon officials have argued that collecting sales taxes would be administratively burdensome. They have also claimed that the company obtains no meaningful benefits from states in which it maintains no facilities and therefore should not have to collect taxes for those states. Amazon's actual sales tax collection practices and other statements by company officials substantially undermine these arguments, however. What actually seems to be driving Amazon's opposition is simply a desire to maximize the significant competitive advantage it gains over its rivals when they must add the typical 5 percent to 10 percent tax to their prices but Amazon does not.

Amazon's refusal to collect sales tax in most states hurts state and local governments' ability to finance education, health care, and other services.[1] States and localities lose more than $7 billion a year in uncollected sales taxes because of a 1992 U.S. Supreme Court decision that allows Internet and catalog sellers to avoid charging the tax to a customer if they do not have a "physical presence" in the customer's state.[2] (Those customers remain legally obligated to self-remit the sales tax to their states on such purchases, but few do.[3])

As discussed in a companion Center report, in 2008 New York enacted an innovative law that effectively deems a retailer to have a physical presence within the state when it has independent "affiliate" websites in the state promoting sales on its behalf.[4] New York's law has been dubbed the "Amazon law" because Amazon is the largest Internet retailer potentially affected by it.

Amazon has taken the lead in opposing New York's law in the courts (unsuccessfully so far), in the media, and in the legislatures of other states that have considered adopting similar laws.[5] This stance is consistent with the aggressive steps Amazon has long taken to minimize the number of states in which it has to charge sales tax. But the company's arguments against being required to collect sales tax in additional states are unconvincing:

- **Amazon says collecting sales tax in every state would be excessively burdensome. However, Amazon *already* collects sales tax in virtually every state for numerous other companies that sell on its website and could do so on its own sales with relatively little**

Ex 2, Pg 8

**additional effort.**  Amazon's argument echoes the rationale used in the 1992 Supreme Court ruling — that it would be overly burdensome for non-physically-present interstate sellers to comply with the states' diverse sales tax rules.  But Amazon already shoulders most of those burdens for thousands of companies that sell on its website.  For example, it calculates and collects sales taxes in every state except one for the Target department store chain, which has outlets in those states and therefore acknowledges an obligation to charge tax on its Internet sales made on Amazon's site.  The fact that Amazon charges sales tax in connection with other companies' sales but not its own suggests that Amazon's primary goal is exploiting its price advantage and not avoiding sales tax compliance efforts and costs.

- **Amazon argues that having to collect sales tax would be unfair, because Amazon doesn't directly benefit from public services in most states.  This suggests that Amazon would willingly charge the tax in states in which it does have a presence and therefore directly benefits from public services.  This is not the case, however; in most of the states in which Amazon does clearly benefit from public services, it collects no tax.**  Amazon and its subsidiaries have facilities in at least 17 states that levy sales taxes.[6]  Those facilities, and the people who work in them, receive the same kinds of state and local public services received by every local retailer that is legally obligated to charge sales tax.  Yet Amazon's website discloses that the company charges tax on its own sales in only *four* of these 17 states.  It is disingenuous for Amazon to argue that it should not have to help support public services in states in which it has *no* physical presence when the company fails to support public services in most of the states in which it *has* a physical presence.

- **Amazon argues that its opposition to collecting sales tax is not driven by a desire to gain a price advantage over competitors.  In fact, at times Amazon representatives have claimed that it *doesn't* gain any such edge.  There is considerable evidence to the contrary, however.**  Amazon's top management has said publicly from the founding of the company that not charging sales taxes gives it a key competitive advantage over its Main Street rivals.  Founder and CEO Jeff Bezos has stated that the desire to exploit this advantage helped drive his decision to locate the company in Seattle; it also appears to have played a major role in how Amazon structures its overall business and individual sales transactions.

For example, Amazon has aggressively pursued a tax-avoidance strategy of establishing separate, legally-incorporated subsidiaries in numerous states and then contending that it is not obligated to charge sales tax in these states because the nominal seller of its products is a separate subsidiary located entirely in a different state.  For example, even though the subsidiary that developed its Kindle electronic book reader is based in California, Amazon does not collect tax in that state on sales of Kindles or any other product.

On one level, the Internet sales tax issue is a conflict between state and local governments seeking to obtain legally due tax revenue and interstate sellers taking advantage of sales tax immunity the Supreme Court has granted them.  But immunity from charging sales taxes also represents a significant, unfair price advantage for online retailers like Amazon, an advantage rooted in obsolete federal policy.  To prevent additional harm to local businesses, policymakers must level the playing field at the earliest opportunity — ideally by appropriate congressional action but, barring that, through self-help approaches like New York's "Amazon law."

2

Ex. 2, Pg 9

**Despite Amazon's Claims to the Contrary, Non-collection of Sales Taxes Gives the Company a Significant Competitive Advantage**

At various times, Amazon officials have denied that the company views its non-collection of sales taxes as a significant competitive advantage. In 1999, for example, spokesperson Bill Curry said, "[P]eople shop online for convenience, for huge selection and great prices, and not because of any sales tax issue."[7] Two years later Richard Prem, Amazon's Vice President for Indirect Taxes and Tax Reporting, told a conference of state tax administrators: "We don't consider [not collecting] tax as a competitive advantage."[8]

But these statements are inconsistent with the explanation by the company's founder, Jeff Bezos, of why he located the company in Seattle:

It sounds counterintuitive, but physical location is very important for the success of a virtual business. We could have started Amazon.com anywhere. We chose Seattle because it met a rigorous set of criteria. It had to be a place with lots of technical talent. It had to be near a place with large numbers of books. It had to be a nice place to live — great people won't work in places they don't want to live. Finally, it had to be in a small state. *In the mail-order business, you have to charge sales tax to customers who live in any state where you have a business presence. It made no sense for us to be in California or New York.*

Obviously Seattle has a great programming culture. And it's close to Roseburg, Oregon, which has one of the biggest book warehouses in the world. *We thought about the Bay Area, which is the single best source for technical talent. But it didn't pass the small-state test. I even investigated whether we could set up Amazon.com on an Indian reservation near San Francisco. This way we could have access to talent without all the tax consequences. Unfortunately, the government thought of that first.*[9] [Emphasis added.]

In short, Bezos regarded the ability to sell sales-tax-free into states with large potential customer bases like New York and California as so important that he was willing to sacrifice direct access to the technical computer and Internet talent concentrated in the San Francisco Bay area.[10]

In addition, each year Amazon's report to the Securities and Exchange Commission acknowledges that the price advantage with which the company starts out vis-à-vis local stores and other competitors that are obligated to charge sales taxes is a key strategic asset:

A successful assertion by one or more states . . . that we should collect sales or other taxes on the sale of merchandise or services could . . . decrease our ability to compete with traditional retailers and otherwise harm our business.[11]

Other e-commerce experts concur that Amazon's practice of not charging sales taxes in most states is an important competitive advantage, particularly as the firm has broadened its market beyond books into more expensive items:

While the recession has cut into some retailers, Amazon has weathered the storm just fine. In fact, the recent success of Amazon is partly due to the fact that it allows shoppers to avoid sales tax. And on pricey items like plasma screen TVs, that's no small discount.[12]

3

Ex. 2, Pg. 10

Because most of Amazon's customers do not pay the applicable taxes directly to their state governments, they perceive purchases from Amazon as significantly cheaper than purchases from competing firms that do charge these taxes. Amazon's management has long been well aware that this gives the company a substantial leg-up in the fiercely competitive retail marketplace.

## Amazon Already Collects Sales Taxes for *Other* Companies That Sell on Its Website, So How Burdensome Can It Be?

The fact that Amazon gains a significant pricing advantage by not charging sales tax almost certainly is one significant reason why the company opposes state efforts to compel it to collect the tax. And it suggests that the company's arguments against having to do so should be critically assessed. Indeed, on close inspection, these arguments do not hold up.

In its 1992 *Quill* decision, the U.S. Supreme Court held that a state could not require a retailer to charge sales tax to the state's residents unless the firm had a "physical presence" within the state. The Court's rationale was that requiring non-physically-present sellers to collect sales taxes under the diverse rules in place in the 45 states and thousands of local jurisdictions that levy them would constitute an excessive burden on interstate commerce.

Amazon has frequently claimed that avoiding such burdens is the company's primary motivation for charging sales taxes in only a few states. In 2008, for example, CEO Jeff Bezos said:

[T]he problem is that there are . . . tens of thousands of separate sales tax jurisdictions, it's not just 50 — one for each state. It's horrendously complicated. . . The rules to obey in all jurisdictions are overly complex, and as a result, we have an undue burden on us.[13]

Yet the company *already* calculates and collects sales tax in at least 44 of the 45 states that levy them for independent companies that sell their merchandise on Amazon's website.

- Amazon collects sales tax on behalf of every sales tax state except Vermont for sales made on its site by Target.com (the web affiliate of Target stores).[14]

- Amazon collects sales tax for items sold on its site by the Macy's department store chain[15] and the Eddie Bauer outdoor clothing and equipment chain;[16] both chains have retail stores in numerous states and appear to acknowledge a legal obligation to charge sales tax in every state in which they have stores.

- Richard Prem stated in July 2008 that Amazon was calculating and collecting sales tax in some states on behalf of approximately 5,000 independent merchants that sell items on its website.[17] Prem stated that these merchants "opt-in" to this service, which suggests that far from being a cost to the company, Amazon actually earns additional revenue by providing it.[18]

Another indication that Amazon has the capacity to comply with state and local sales taxes is that it fully complies with "value-added" taxes imposed on its sales in foreign countries.[19] Foreign VATs are analogous to state sales taxes at the final retail level, but international law is much clearer than U.S. federal law in requiring that such taxes be collected. One might imagine that if collecting such

4

Ex. 2, Pg. 11

taxes were in fact excessively burdensome to Amazon it would discontinue sales in foreign countries.

These facts strongly suggest that Amazon would be able to calculate and collect sales tax for every state in connection with sales of its *own* merchandise with the flip of a (software) switch if it chose to do so.[20]  The additional effort and cost involved in filing returns with and transmitting payments to state revenue departments would be relatively small compared to the cost of purchasing the software needed to calculate the proper tax, integrating the software into its billing system, and collecting the tax from purchasers — all of which Amazon already does.[21]

Moreover, scores of companies are obligated to charge sales tax in all or nearly all states on their Internet and catalog sales because they have a physical presence within the states.  Walmart, Barnes & Noble, and Best Buy, for example, manage to collect sales tax on their Internet sales in every state in which they have a retail store.

For all these reasons, Amazon's claim that collecting and remitting current state and local sales taxes would be a significant burden is highly dubious.

## Amazon Fails to Collect Taxes in Most States in Which It Has a Substantial Physical Presence

Avoiding the "administrative burden" of coping with the states' diverse tax rules is not Amazon's only stated rationale for not collecting sales taxes.  A number of years ago, CEO Jeff Bezos argued:

> In Washington state, where we have a presence, we get police protection, we get fire protection.  We send our kids to local schools. . . .  I don't see why . . . since we get no services from North Carolina, that they should be able to force us to collect taxes for them.[22]

As with the "burden" argument, however, it is difficult to reconcile this argument with Amazon's behavior.  If Bezos thought the appropriate principle were to charge taxes where Amazon benefits from local services, then Amazon would be collecting taxes in at least 17 states in which the company or its subsidiaries have headquarters, warehouse, customer service, R&D, or other types of facilities.  Instead, Amazon charges tax to customers in only four of these states.[23]  (The tactics it employs to achieve this result will be discussed below.)

The facilities and their employees and contractors in these 17 states — for example, the California R&D lab where Amazon developed its Kindle electronic book reader — receive the same kinds of state and local services that any other business located in the state receives.  For example, they receive police and fire protection for the facilities and the people who work there, and they benefit from the roads that enable employees, equipment, and inventory to get in and out.  Nonetheless, in 13 of those 17 states, Amazon recognizes no obligation to help pay for these services by collecting state and local sales taxes.  Here again, it appears that Amazon's desire to maximize its competitive pricing advantage has trumped the principles governing its sales tax collection practices that its managers have asserted.

5

Ex. 2, Pg. 12

**Amazon Benefits from Public Services in States in Which It Lacks a Physical Presence**

Leaving aside the inconsistency between Amazon's stated principles and its tax-collection practices, remote sellers often benefit extensively from the public services their customers' home states provide. States and localities play a critical role in providing the range of safeguards and services that permit interstate commerce to flourish.[24] For example, they furnish the roads that enable goods to travel between remote sellers and their customers, as well as the police and fire protection for the goods in transit. Buyers and sellers thousands of miles apart are willing to do business because they know that consumer protection agencies and courts of the purchaser's state can adjudicate disputes over product quality and payment obligations.

Amazon arguably has been a particularly great beneficiary of public services provided by the states in which its customers reside. The company started out as a bookseller, and books still appear to account for a significant share of its sales. Ninety percent of elementary school children in the United States attend public schools,[25] which state and local sales tax revenues help support.[26] Yet Amazon has gone to great lengths to avoid helping states and localities obtain the revenue to pay the teachers and librarians who help create the market for its books and Kindles among younger Americans. This is particularly disappointing given that — as noted above— Amazon collects value-added taxes for foreign countries, helping ensure that *their* schools have the needed resources.[27]

## Amazon Has a History of Aggressive Tax Planning

As the previous sections show, Amazon's arguments for why it shouldn't collect tax are inconsistent with its own practices. In reality, its main goal is to gain a significant pricing advantage over other retailers — both local and Internet merchants — that do charge tax. The extremely high value that Amazon places on this price advantage is demonstrated by the lengths to which the company has gone to preserve it. Amazon has been tremendously aggressive in structuring both its overall business and its sales transactions to preserve its ability to sell on a sales-tax-free basis in as many states as possible.

Amazon's basic strategy is often referred to as "entity isolation": placing various pieces of its overall business in individually-incorporated subsidiaries and then contending that a subsidiary's physical presence in a given state does not obligate Amazon to collect that state's sales tax because the subsidiary does not sell merchandise directly to customers. For example, Amazon subsidiary A-9, based in California, is responsible for the ongoing refinement of the search engine customers use to find items on Amazon's website — obviously a key asset for a company that sells 24 million different products.[28] Likewise, Amazon subsidiary Lab 126, also based in California, developed the Kindle electronic book reader, which Amazon's management hopes will be a major new profit center for the company.[29] Amazon has three additional subsidiaries with locations in California.[30] Nonetheless, Amazon does not collect state and local sales taxes on its sales into that state, evidently on the grounds that these subsidiaries "sell" their services to other parts of the company but don't sell merchandise to consumers.[31]

Amazon uses the same basic approach to immunize its core business activity — selling and distributing products to its customers — from sales taxation. The company has warehouses in six

6

Ex. 2, Pg. 13

states in which it does not charge sales tax on its own sales: Arizona, Indiana, Nevada, Pennsylvania, Texas, and Virginia.[32] Amazon apparently believes it does not have to charge tax in those states because it has structured sales from those warehouses as "drop shipments." To minimize the amount of inventory they have to manage, many Internet retailers buy a product from the manufacturers or wholesaler only after they receive an order for it and then have the latter ship it directly to the customer, never taking possession of the item themselves. Such drop shipments, which normally involve manufacturers and retailers that are completely independent of each other, sometimes escape sales taxation. Amazon maintains that transactions fulfilled out of *its own inventory in its own warehouses* are drop shipments because the warehouse and the website that accepts the order are in nominally separate corporations.[33]

The above tax-avoidance strategies may be perfectly legal in some, most or even all states.[34] Nonetheless, the company's claimed tax immunity in numerous states in which it maintains facilities performing core functions of its retailing business represents a blatant circumvention of the *intent* of the "physical presence" test established by the *Quill* decision. This suggests that state policymakers may need to be equally aggressive if they want Amazon to operate under the same sales tax principles as other retailers do.

## Conclusion

In its 1992 *Quill* decision, the U.S. Supreme Court ruled that businesses not "physically present" in a state need not collect and remit sales taxes on the state's behalf because of the "burden" of complying with varying state sales tax rules. Amazon claims to be protected by the *Quill* decision in numerous states despite the fact that its business practices diverge from both of the decision's key parameters. First, Amazon *already* has accepted responsibility for collecting and remitting sales taxes in all states but one on behalf of other companies that sell on its website. Second, Amazon — the business enterprise as a whole — *has* a physical presence in many states in which it claims sales tax immunity.

By claiming sales tax immunity in the vast majority of states, Amazon has enjoyed an unfair 5 percent to 10 percent price advantage over local retailers, while also depriving states and localities of hundreds of millions of dollars of legally due revenue each year.

At the end of the *Quill* decision, the Supreme Court effectively invited Congress to establish reasonable ground rules under which non-physically-present sellers could be obligated to collect state sales taxes. Fair federal legislation that strikes an appropriate balance among the interests of states, Main Street businesses, and Internet and other interstate sellers remains the optimum solution to the interstate sales tax problem. (Amazon has stated it would not oppose such legislation, but with a caveat that would likely make its enactment impossible. See the Appendix.) In the meantime however, state initiatives like New York's "Amazon Law" can help level the competitive playing field between interstate sellers and local merchants.

Ex 2, Pg 14

**Appendix:**
**Amazon's Position on Federal Legislation Solving the Internet Sales Tax Problem**

In 2006, Paul Misener, Amazon's Vice President for Global Public Policy, told Congress that the company would not oppose proposed federal legislation that might eventually compel the company to charge sales tax in every state.[35] Such legislation has been introduced in most recent sessions of Congress. It would empower states that have entered into the "Streamlined Sales Tax Agreement" to require even non-physically-present Internet sellers to collect and remit their sales taxes (assuming the states also meet certain other conditions specified in the bill).

Some 23 states have entered into the Streamlined Agreement, which commits member states to revise their sales tax codes in order to ease sales tax compliance for interstate sellers like Amazon that would have to collect tax everywhere were the federal legislation to be enacted. Amazon is a member of a business advisory group to the Streamlined Agreement, and company spokesperson Patty Smith recently reaffirmed the company's openness to collecting sales taxes for the states under conditions tracking the outline of the proposed federal legislation: "We'd be OK with a sales tax collection requirement under a system that is as simple as the current physical-presence-based system and is evenly applied to all sellers."[36]

At the same time, however, Amazon has helped stymie the enactment of the federal legislation for several years. To achieve enactment of the legislation, the states have always been willing to include in it so-called small business *"de minimis"* language. This would provide that a business with total annual nationwide sales below a certain amount — $5 million has been proposed most often — would not be required to collect the sales tax in a state in which it lacked a physical presence. The provision acknowledges that even under a substantially simplified and harmonized system, the smallest businesses could face difficulties in complying with sales taxes on a nationwide basis. Like the states, the organizations of store-based retailers that have lobbied for the legislation for many years support the *de minimis* provision.

All versions of the legislation to date have included a *de minimis* provision, a strong indication that the bills' sponsors believe it is essential to achieving enactment. Yet Amazon has expressed strong reservations about any such provision and much stronger opposition to the $5 million threshold under discussion. Ironically, Amazon claims that such a threshold would be unfair to small Main Street retailers — the same retailers that Amazon has harmed through its aggressive exploitation of its own sales tax immunity. In the same testimony cited above, Amazon VP Misener stated:

Under one proposal, sellers with less than $5 million in annual gross remote taxable sales would be exempt from collection requirements. But roughly half of e-commerce is conducted by such companies. If such an exemption were adopted, small Main Street sellers would continue to face the price disadvantage of having to collect sales tax while their out-of-state competitors did not, and the states would end up foregoing roughly half of the sales tax revenue otherwise available. Even if the threshold were reduced to $100,000, roughly a quarter of online sales would enjoy a significant price advantage over sales by small Main Street retailers, and the states would be denied the same portion of the available revenue.

Misener stated: "Hopefully, policymakers would never conclude that this disparity would be fair to Main Street small businesses."

8

Ex. 2, Pg. 15

Given that 45 states levy sales taxes, a $5 million *de minimis* provision would mean that a small Internet retailer selling on a nationwide basis would be required to collect sales tax once its sales exceeded an average of approximately $100,00 per state.  Clearly, Main Street businesses face little real competition from such small firms; they are much more adversely affected by the sales tax immunity of a retailing behemoth like Amazon, with more than $10 billion of North American sales in 2008.[37]  It therefore is difficult to take seriously Amazon's professed concern for the unfairness to Main Street businesses of having to compete with Internet merchants protected by a $5 million threshold.

Amazon's position that a $5 million threshold is too high has encouraged Amazon's competitor, eBay, to press its position that a $5 million threshold is too *low*.[38]  In 2005, the two companies' unwillingness to accept the $5 million amount resulted in the introduction of two competing versions of the bill — significantly undercutting its political prospects.[39]

It is not entirely clear why Amazon opposes the $5 million threshold so strongly.  Amazon's opposition to *de minimis* proposals may mean that the company wants to preserve its own sales tax immunity indefinitely and realizes that undermining the provision would effectively scuttle any prospects for federal legislation.  Alternatively, Amazon may see substantial future revenue opportunities in providing sales tax collection compliance services to small businesses and wants to maximize the number of them obligated to collect sales taxes throughout the United States.  (In his testimony, Misener explained that if Congress enacted the legislation, regardless of the threshold, the vast majority of small businesses required to collect sales tax on a nationwide business would likely contract-out that function to large companies.[40])

A third possible explanation for Amazon's position on the *de minimis* threshold is that the company is willing to collect sales taxes nationwide but only if all other businesses, including the very, very smallest, are required to do the same.  It bears repeating, however, that Amazon's major competitors — the web operations of companies like Barnes & Noble, Borders, Walmart, and Best Buy — already collect sales tax in almost every state.

Regardless of the explanation for Amazon's opposition to a significant de minimis threshold for small businesses, it is clear that the effect of its opposition has been to splinter the coalition seeking the federal legislation and reduce chances for eventual enactment.

Ex. 2, Pg. 16

## Notes

[1] Amazon charges sales tax on sales of its own merchandise in 5 states — its headquarters state of Washington, Kansas, Kentucky, North Dakota, and (as a result of the enactment of the "Amazon law") New York. For a description of the states in which Amazon collects sales taxes, see: http://www.amazon.com/gp/help/customer/display.html?ie=UTF8&nodeId=468512&qid=1245865150&sr=1-1.

[2] See: Donald Bruce, William F. Fox, and LeAnn Luna, "State and Local Government Sales Tax Revenue Losses from Electronic Commerce," April 13, 2009; http://www.streamlinedsalestax.org/uploads/downloads/EC%20Executive%20Committee%20Meeting%20Docs/SST P%20e-commerce%202009%20REV041309.pdf.

[3] Technically, the tax that is due on an interstate sale is an equivalent "use tax" rather than the sales tax. This is true regardless of whether the use tax is collected by the seller or self-remitted by the purchaser. Nonetheless, as is common, this report will refer to the collection of "sales taxes."

[4] See: Michael Mazerov, "New York's Amazon Law: An Important Tool for Collecting Sales Taxes Owed on Internet Sales," Center on Budget and Policy Priorities, July 23, 2009; http://www.cbpp.org/cms/index.cfm?fa=view&id=2876.

[5] Rhode Island and North Carolina have also enacted versions of New York's law. The California and Hawaii legislatures also approved such laws, but these were vetoed by the states' governors and the vetoes were not overridden.

[6] Amazon's Securities and Exchange Commission Form 10-K for the year ended December 31, 2008 states (page 16): "We lease our corporate headquarters in Seattle, Washington. We also lease additional corporate office, fulfillment and warehouse operations, customer service, and other facilities throughout the United States, principally in Arizona, California, Delaware, Florida, Indiana, Kansas, Kentucky, Michigan, Nevada, New Hampshire, New Jersey, North Dakota, Pennsylvania, South Carolina, Texas, Virginia, Washington, West Virginia, and Wisconsin." (Among the 19 listed states, Delaware and New Hampshire do not levy sales taxes.) Since the text states that Amazon leases facilities "principally" in those states, it may have facilities in additional states. Indeed, Amazon's job listing site, at https://amazon.taleo.net/servlets/CareerSection?art_ip_action=FlowDispatcher&flowTypeNo=13&alt=1&art_servlet language=en&csNo=2 is equipped to list job openings at various Amazon subsidiaries in the District of Columbia and an additional eight states beyond those identified in its 10-K: Colorado, Connecticut, Georgia, Idaho, Louisiana, Massachusetts, New York, and Rhode Island.

[7] Mickey Alam Khan, "Booksellers Group: E-Retailers Should Collect Sales Tax," DM News.com, September 28, 1999.

[8] Quoted in Karen Setze, "Education Seen as Key to Streamlined Sales Tax Project's Success," State Tax Notes, August 22, 2001. In addition, Amazon Vice President Paul Misener told a congressional hearing in 2006: "We've known all along that . . . we don't need a sales tax price advantage to do very well with respect to our competition." Testimony to a hearing of the Subcommittee on Regulatory Reform and Oversight, House Committee on Small Business, "The Internet Sales Tax: Headaches Ahead for Small Business?" February 8, 2006.

[9] William C. Taylor, "Who's Writing the Book on Web Business," Fast Company, October/November 1996.

[10] As discussed below, Amazon now has five subsidiaries in California that have developed key assets of the corporation, yet still does not charge sales tax on its California sales.

[11] Amazon.com, Inc. Form 10-K for the year ended December 31, 2008, p. 14.

[12] Louis Navellier, "All-American Stock #2: Amazon," Blogging Stocks website, July 4, 2009, www.bloggingstocks.com/2009/07/04/all-american-stock-2-amazon-amzn/.

[13] Andrea James, "Bezos: Sales Tax Is Horrendously Complicated," Amazon & the Online Retail Blog of the Seattle Post-Intelligencer, June 30, 2008; blog.seattlepi.com/amazon/archives/142371.asp. Similarly, in 1999, a company spokesperson complained: "States don't tax the same things; even within localities the tax rates are different. And the burden on any company to figure out what's taxable at which street address is overwhelming." Amazon spokesman Bill Curry quoted in Jim Morrill, "Bill Targets Sales Tax from Net Shoppers," Charlotte Observer, June 20, 1999.

10

Ex. 2, Pg. 17

[14] See the source cited in note 1.

[15] Macy's customer information section of Amazon's site states: "Applicable sales tax will be added for merchandise shipped to states in which we have a legal obligation to collect sales tax." http://www.amazon.com/gp/help/seller/shipping.html/ref=ms_mhelp_ship?ie=UTF8&seller=A2HLK9C2IWJJB7#tax. That is vague, but when Macy makes sales from its own site it concedes that it must collect sales tax on its online sales in all states in which it has a Macy's store.  In all likelihood, it is doing the same with respect to sales made via Amazon's website.

[16] Testimony of Richard Prem, Amazon.com Vice President for Indirect Taxes and Tax Reporting, to a hearing of the California Board of Equalization, July 8, 2008.  The audio feed of this hearing was archived until recently at www.visualwebcaster.com/event.asp?id=49383 (hereafter "Prem testimony").  Prem's statement regarding Amazon's collection of sales tax on behalf of Eddie Bauer appears at approximately 1:21 into the recording.

[17] Prem testimony at approximately 1:14.  Prem did not indicate whether this count includes independent merchants located outside the United States on whose behalf Amazon is calculating and collecting "value-added taxes," the foreign analog of state retail sales taxes.

[18] It seems unlikely that Amazon would offer sales tax collection services at a loss, and much more likely that it charges enough for the service to make at least some profit.

[19] "In accordance with the laws governing members of the European Union, Amazon.com.uk is obliged to charge VAT on all orders delivered to destinations in member countries of the EU.  In general, VAT is charged in accordance with the local legislation in each member state." http://www.amazon.co.uk/gp/help/customer/display.html?nodeId=502576.

[20] More generally, of course, Amazon is one of the most technologically sophisticated companies in the world. According to the Prem testimony: "I think many people think of us just as a bookseller but really we're a technology company and we're about enabling technology."  Prem went on to state the following: the company sells 24 million different items to 70 million different customers; 35 percent of the items sold on its website are sold by 1 million independent merchants whose sites Amazon powers or on whose behalf Amazon bills purchasers and/or actually fulfills orders from its own warehouses; and the company employs over 4,000 software development engineers and 15 Ph.D.s in mathematics.  Amazon has also developed a propriety search engine to search its site for all the items it sells and built a huge database that allows users to search for text within hundreds of thousands if not millions of individual books.  In sum, the claim that collecting and remitting sales taxes on its own retail sales for every state and locality would represent a significant burden for the company would be difficult to take seriously — even if the company were not *already* performing these tasks on behalf of Target.com and 5,000 third-party sellers.  As a technology blogger for the *New York Times* wrote: "When you look at all the things Amazon does every day — such as the recommendations it offers about goods to buy, or the way it optimizes its warehouse operations — figuring out sales tax looks like a job for the summer intern."  Saul Hansell, "Amazon Plays Dumb in Internet Sales Tax Debate," *New York Times* "Bits" blog, February 13, 2008; bits.blogs.nytimes.com/2008/02/13/amazon-plays-dumb-in-internet-sales-tax-debate/?pagemode=print.

[21] Many companies — the Sears mail order catalog operation, for example — have been legally obligated for decades to charge sales tax in numerous states or every state.  Thus, a number of companies specialize in providing and maintaining computer software that substantially automates sales/use tax compliance.  Probably the best-known providers are Vertex, Inc. and Taxware International (acquired several years ago by the ADP payroll-processing firm).  A press release issued by Sabrix, Inc. on August 5, 2009 revealed that Amazon uses the company's "Sabrix Application Suite [which] seamlessly connects to all financial applications requiring the determination, calculation, and recording of transaction taxes."

[22] Associated Press, "Bezos to Booksellers: No New Sales Taxes," June 2, 2000.  Bezos made the same argument in 2008, telling a stockholder meeting: "We're not actually benefiting from any services that those states provide locally, so it's not fair that we should be obligated to be their tax collection agent since we're not getting any of the services."  Andrea James, "Bezos: Sales Tax Is Horrendously Complicated," Amazon & the Online Retail Blog of the *Seattle Post-Intelligencer*, June 30, 2008; blog.seattlepi.com/amazon/archives/142371.asp.

11

Ex. 2, Pg. 18

[23] See the sources cited in notes 1 and 6.

[24] In the *Quill* decision, the Supreme Court explicitly *rejected* the argument that non-physically-present sellers do not benefit sufficiently from services provided by their customer's states to be fairly required to charge sales tax in those states. The Court wrote: "[T]here is no question that Quill [Corporation] has purposefully directed its activities at North Dakota residents . . . and that the . . . tax is related to the benefits Quill receives from the State." The basis of the Court's upholding of a "physical presence" test in *Quill* was a desire to shelter interstate commerce from excessive sales tax compliance burdens, not a belief that requiring out-of-state retailers to collect sales tax would be unfair to *them*.

[25] U.S. Census Bureau data, www.census.gov/compendia/statab/tables/09s0217.pdf.

[26] According to the most recent data available from the U.S. Census Bureau, state and local sales and use taxes supplied 23 percent of all state and local tax receipts and 16 percent of all state and local revenues from their own resources in 2007. K-12 education accounted for 23 percent of all state and local government spending in the same year.

[27] As discussed above, the fact that Amazon charges all applicable value-added taxes on its sales in foreign countries is further evidence that it could comply with sales taxes in every state relatively easily if compelled to do so. It may raise a question, however, as to why Amazon complies with VATs. The answer, quite simply, is that those countries' tax laws say it has to; there are no foreign analogs of the *Quill* decision to immunize the company from VAT-collection obligations. Amazon complies with applicable tax law when its legal obligations are clear, as indicated by the fact that it chose to comply with New York's affiliate nexus law rather than flout it.

[28] See: www.a9.com/-/company/.

[29] See: www.lab126.com/.

[30] See: http://www.amazon.com/Locations-Careers/b/ref=amb_link_5763692_4?ie=UTF8&node=239366011&pf_rd_m=ATVPDKIKX0DER&pf_rd_s=left-4&pf_rd_r=0XT9F1QBKX7KR8HWSETG&pf_rd_t=101&pf_rd_p=465323071&pf_rd_i=203348011.

[31] The courts have granted states some legal authority to ignore the division of a corporation into separate subsidiaries in order to prevent state *corporate income tax* avoidance. The courts have done this by authorizing a state corporate tax practice known as "combined reporting," which effectively treats in-state and out-of-state subsidiaries as one corporation for purposes of calculating the tax. Some commentators argue that the same legal theory that underlies the authorization of combined reporting supports state action to require an out-of-state Internet retailer to charge sales tax in a state in which a related subsidiary is physically present. (See: John A. Swain, "Cybertaxation and the Commerce Clause: Entity Isolation or Affiliate Nexus?" *Southern California Law Review*, January 2002.) States like California confronting an entity-isolation strategy like Amazon's should indeed pursue this approach, but it must be acknowledged that it is largely untested and that the few state courts that have considered it have split on its validity.

[32] See the source cited in note 30. See also: David Dekok, "Sales Tax or No Sales Tax: An Online Dilemma," *Harrisburg Patriot-News*, May 26, 2008: "Patty Smith, a spokeswoman for Amazon.com, said the company legally avoids collecting sales tax in Pennsylvania because the distribution centers are owned by Amazon subsidiaries, not the parent company."

[33] In May 2008, the *Dallas Morning News* began raising questions about how Amazon could have a warehouse in Texas and yet not charge sales tax in the state. (See: Maria Halkias, "Amazon.com May Owe Texas Millions in Uncollected Sales Taxes," May 9, 2008.) Amazon replied that the warehouse was owned by a separate Amazon subsidiary, the state was well aware of Amazon's presence, and the company was fully compliant with the state's sales tax law. (Markia Halkias, "Amazon Says It Owes No Sales Tax to State," May 9, 2008.) The company acknowledged later that summer that the structuring of the transactions as drop shipments involving its retailing arm and separately incorporated warehouses was the basis of its sales tax immunity: "We have an affiliate that operates our fulfillment center in Irving, Texas. . . . And it handles Amazon inventory that it sells and drop ships, and it also handles . . . Target inventory. . . . So they [the Texas fulfillment center] provide services to Amazon's retail businesses, what I would refer to as a 'drop shipper.' . . ." Prem testimony at approximately 1:18.

12

Ex. 2, Pg. 19

Prem reiterated that Texas had completely signed off on the company's position that despite the presence of the warehouse, it was not obligated to charge sales tax on any of its own retail sales into the state (Prem testimony at approximately 1:09). Texas may be reconsidering its position, however; recent press reports indicate that the state is still investigating the company. See: Geoffrey A. Fowler and Erica Alini, "States Plot New Path to Tax Online Retailers," *Wall Street Journal*, July 3, 2009.

[34] Virginia has given an Internet retailer claiming to be engaged in a "drop shipment" from an affiliated in-state warehouse a formal acknowledgment that it is not required to charge sales tax in the state. (Rulings of the Tax Commissioner, Number 07-24, March 27, 2007; www.policylibrary.tax.virginia.gov/OTP/Policy.nsf.) On the other hand, New Jersey recently successfully challenged this kind of self-dealing "drop shipment" as an abusive transaction aimed solely at tax avoidance; the court held that the company was obligated to charge sales tax on drop shipments from the New Jersey warehouse owned by its subsidiary to New Jersey customers. (*Drugstore.com* v. *New Jersey Division of Taxation*, Tax Court of New Jersey, February 11, 2008.)

Amazon may have received advance rulings from states in which it has warehouses or other facilities (in addition to Virginia) that it is not obligated to collect sales taxes in those states. It also may have had that position upheld following an audit (which appears to be the case in Texas, at least up to now). Finally, it may have negotiated sales tax immunity with a state economic development department as a condition of agreeing to site the facility in the state.

[35] Prepared remarks of Paul Misener, hearing on "The Internet Sales Tax: Headaches Ahead for Small Business," Subcommittee on Regulatory Reform and Oversight, House Committee on Small Business, February 8, 2006.

[36] Scott Morrison, "Amazon Fights Sales Tax Drive, Despite Modest Impact," *Wall Street Journal*, June 25, 2009. Smith may have intended to say "simpler than" rather than "as simple as."

[37] Amazon.com annual 10-K report to the Securities and Exchange Commission for 2008. Amazon does not separately report sales for the United States, Canada, and Mexico.

[38] See the testimony of Brian Bieron of eBay, Inc. at the same hearing at which Misener testified.

[39] See: Eric Parker, "U.S. Senators Introduce Sales Tax Streamlining Legislation," *State Tax Notes*, December 22, 2005. Referring to one version of the legislation, which instead of a $5 million *de minimis* proposed that the Small Business Administration set the threshold, Neal Osten of the National Conference of State Legislatures stated: "You can't expect an agency [the SBA] to do this in a reasonable time frame. It's a poison pill. I think it's really an effort to kill the bill. Amazon wanted a *de minimis* standard of $10,000, while eBay wanted it to be $21 million. There's no real desire on their part [Amazon and eBay] to work this out."

[40] Obviously with eBay in mind, Misener stated, "Amazon.com will offer sales tax collection services to our small business seller customers, and I am sure that our online competitors also can and will unless they can take advantage of some legal loophole."

Ex. 2, Pg 20

# EXHIBIT 3

Ex. 3, Pg. 21

# Center on Budget and Policy Priorities

820 First Street, NE, Suite 510
Washington, DC 20002

Tel: 202-408-1080
Fax: 202-408-1056

center@cbpp.org
www.cbpp.org

Robert Greenstein
Executive Director

T. Scott Bunton
Deputy Director

**Board of Directors**

David de Ferranti, Chair
*Results for Development Institute*

Henry J. Aaron
*Brookings Institution*

Ken Apfel
*University of Maryland*

Jano Cabrera
*Burson-Marsteller*

Marian Wright Edelman
*Children's Defense Fund*

Beatrix Hamburg, M.D.
*Cornell Medical College*

Frank Mankiewicz
*Hill and Knowlton*

Lynn McNair
*Salzburg Global Seminar*

Richard P. Nathan
*Nelson A Rockefeller Institute of Government*

Marion Pines
*Johns Hopkins University*

Robert D. Reischauer
*Urban Institute*

Susan Sechler
*German Marshall Fund*

Juan Sepulveda, Jr.
*The Common Experience/ San Antonio*

William Julius Wilson
*Harvard University*

**Emeritus**

Barbara Blum
*Columbia University*

James O. Gibson
*Center for the Study of Social Policy*

John Kramer
*Founding Chair
1937-2006*

Sol Price
*1916 - 2009*

## CBPP STATEMENT

*For Immediate Release:*
Tuesday, March 9, 2010

*Contact:*
Shannon Spillane, 202-408-1080,
spillane@cbpp.org

### STATEMENT BY MICHAEL MAZEROV, SENIOR FELLOW, ON AMAZON'S CANCELLATION OF ITS COLORADO AFFILIATE PROGRAM

Last month, Colorado enacted a law that requires Amazon.com and other Internet retailers that do not collect and remit Colorado sales tax on what they sell in the state to tell their Colorado customers that they may owe sales tax on their purchases, and also to tell the state each year the total dollar value of items purchased by each purchaser. Yesterday, Amazon told its small business partners in Colorado that it would immediately stop doing business with them unless Colorado repeals that law. This is an act of sheer retaliation.

Those partners, often called "affiliates," are small businesses and nonprofit organizations that link to Amazon's web site from their own sites and receive a commission when readers click on the links and buy something from Amazon. Amazon is dropping all its Colorado affiliates — even though there is no connection between the affiliate program and the new law. Eliminating the Colorado affiliate program will not eliminate Amazon's obligation to comply with the law. Amazon's actions are analogous to corporate hostage-taking; the company threatens to harm its affiliates in the state and encourages them to ask their state legislators to repeal the law in order to avoid that harm.

We've long known that Amazon doesn't want to collect sales taxes. It is determined to maintain its price advantage over local Colorado merchants by not charging tax. But what's good for Amazon is bad for schools, roads, and other public services in Colorado, and it's bad for local Colorado merchants as well. It is reasonable for Colorado to insist that Amazon and other Internet retailers tell their Colorado customers that the customers are legally obligated to pay taxes to support state services, just like customers of local Colorado merchants do.

This is not the first time that Amazon has cancelled an affiliate program in a state because it didn't like a new state law. It did so in North Carolina and Rhode Island in response to laws that directly used the in-state presence of affiliates as the basis for requiring Internet retailers to collect sales taxes; by cancelling the programs, Amazon could escape that requirement. But Amazon's action in Colorado marks the first time it has retaliated against affiliates for a law unrelated to its affiliate program.

Many of Amazon's Colorado partners have worked hard to promote the company. Yesterday's action shows that Amazon would rather toss those business relationships over the side and harm its partners than accept a reasonable role in ensuring collection of legally owed taxes that help pay for necessary state services. For Colorado to reverse its law now would encourage other large corporations to engage in similar acts of retaliation.

Colorado's legislature should be recognized for its leadership on this issue. There is strength in numbers. If other states follow Colorado's lead and require businesses selling into the state to inform customers of their legal obligation to self-pay taxes on their purchases, the efforts of Amazon and possibly other corporations to pick off states one by one will be thwarted.

# # #

**The Center on Budget and Policy Priorities** is a nonprofit, nonpartisan research organization and policy institute that conducts research and analysis on a range of government policies and programs. It is supported primarily by foundation grants.

Ex. 3, Pg 22

# EXHIBIT 4

Ex 4, Pg. 23



Center on
Budget
and Policy
Priorities

820 First Street NE, Suite 510
Washington, DC 20002

Tel: 202-408-1080
Fax: 202-408-1056

center@cbpp.org
www.cbpp.org

July 23, 2009

# NEW YORK'S "AMAZON LAW": AN IMPORTANT TOOL FOR COLLECTING TAXES OWED ON INTERNET PURCHASES

By Michael Mazerov

## Summary

The inability to collect all sales taxes that are legally due on purchases made over the Internet costs states billions of dollars a year in lost revenue. In 2008, New York State enacted an innovative law that helps to address this problem. Rhode Island adopted a similar measure this year. All states with sales taxes should give serious consideration to doing so as well.

New York and Rhode Island's new laws are directed toward online retailers that are located outside the state and do not collect the sales tax that is due on sales to in-state customers. The laws rely on the fact that many such out-of-state retailers enlist independent in-state websites known as "affiliates" to promote sales. Affiliates place links on their websites to the retailer's site and receive a commission when someone follows the link and buys something from the retailer. The states determined that this relationship with affiliates satisfies the requirement set down by the U.S. Supreme Court that states can require sales tax collections only from retailers with in-state property, employees, or independent sales representatives. A New York court has already upheld the law, and the Tennessee attorney general has issued a formal opinion that a version introduced there was constitutional.

New York's measure — an amendment to the state's sales tax code — has been dubbed the "Amazon law" because Amazon.com is the nation's largest Internet retailer and until passage of New York's law did not collect sales taxes from any New York customers. In addition to Amazon, scores of other online retailers are potentially affected. New York's law is already raising tens of millions of dollars a year — enough to pay the salaries of hundreds of schoolteachers, firefighters and police officers.

Legislators in at least seven other states introduced similar bills this year. The California and Hawaii legislatures approved them but did not override their governors' vetoes. A similar bill is still pending in North Carolina, and press reports indicate the legislature is likely to approve it.

Sales taxes are already legally due on Internet sales if the item is taxable in a local store. The consumer is supposed to pay the tax directly to the state, but by far the most effective way to obtain the revenue is to require the seller to charge the tax. Because the measure enacted in New York and

Rhode Island extends such responsibility to the large number of Internet merchants with affiliate programs, it represents a valuable tool to begin to chip away at the problem of untaxed Internet sales. The law:

- Mitigates states' loss of much-needed revenue;

- Reduces the competitive disadvantage faced by local merchants and those Internet sellers (like Amazon competitors Barnes & Noble and Best Buy) that do collect sales taxes; and

- Reduces the disproportionate impact of sales taxes on low-income persons arising from their frequent inability to buy online and thus avoid the taxes.

Because most of the largest Internet retailers operate affiliate programs, a significant portion of the revenue loss arising from untaxed Internet sales could be avoided if numerous states enacted and enforced similar laws. Those online retailers that choose to drop their in-state affiliates rather than collect taxes seem likely to lose market share to local merchants and to online sellers that *do* collect taxes. If a significant number of the largest states enact these laws, it seems likely that many Internet retailers will eventually reinstate their affiliate programs and begin collecting the sales tax.

Not every Internet retailer operates an affiliate program, so emulating New York's law is only a partial response to the Internet sales tax problem. A comprehensive solution will require a federal law empowering states and localities that have simplified and harmonized their sales taxes to require all large remote sellers to collect sales taxes, whether or not they are physically present in their customers' states. Bills to do this have been introduced in Congress for many years, but they have not advanced.[1] In the meantime, the action taken by New York and Rhode Island is an important strategy for states to adopt on their own behalf.

## Failure to Tax Internet Sales Is Harmful and Inequitable

The current state of affairs, where some Internet retailers collect sales tax and some do not, has prevailed for far too long. The failure to collect taxes owed on Internet sales costs states and local governments billions of dollars a year in lost revenue, making it harder to fund critical public services like education and health care.[2] It forces lower-income households to shoulder an unfairly large share of sales tax obligations as more affluent consumers avoid sales taxes by shopping online.[3]

---

[1] The most recent such bill was H.R. 3396, introduced in 2007. Reintroduction of similar legislation is expected in the current session of Congress in the next few months.

[2] A recent study by economists at the University of Tennessee estimated that state and local governments lost a minimum of $7.2 billion in uncollected sales taxes on e-commerce in 2007, and that this will rise to $11.4 billion by 2012. See: Donald Bruce, William F. Fox, and LeAnn Luna, "State and Local Government Sales Tax Revenue Losses from Electronic Commerce," April 13, 2009; www.streamlinedsalestax.org/Execitive%20Committee/Previous_meetings/4_13_09/SSTP%20e-commerce%202009%20REV041309.pdf. These estimates do not include lost revenue from catalog, TV home shopping, and other forms of interstate or "remote" sales.

[3] The most recent data available from the U.S. Census Bureau indicate that in 2005, only 33 percent of people with incomes in the lowest 20 percent of the income distribution used the Internet for any purpose (including shopping), compared to 80 percent of people in the highest-income 20 percent. www.census.gov/population/socdemo/computer/2007/tab04.xls.

Ex. 4, Pg. 25

It also undermines local businesses. Remote sellers get a 5 percent to 10 percent price advantage over "Main Street" businesses when they do not charge sales tax. Given the inherently narrow profit margins in retailing, the loss of sales to remote sellers resulting from this price advantage can make it much harder for some local businesses to survive.[4]

Adding to the inequity of the current situation is the fact that remote sellers benefit extensively from the public services their customers' home states provide. States and localities play a critical role in providing the range of safeguards and services that permit interstate commerce to flourish. For example, they furnish the roads that enable goods to travel between remote sellers and their customers, as well as the police and fire protection for the goods in transit. Buyers and sellers thousands of miles apart are willing to do business because they know that consumer protection agencies and courts of the purchaser's state can adjudicate disputes over product quality and payment obligations.

Perhaps unsurprisingly, not every online retailer shares this view. The CEO of Overstock.com, an outspoken opponent of the new law, claims it would be "patently unfair" to have to collect California sales taxes under a proposed law in that state because "[W]e don't impose the same burdens on local state infrastructure that locally based business do."[5] Yet Overstock.com does, in fact, benefit from California tax-funded services — as one example, it is using the tax-funded California court system to pursue a litigation campaign against hedge funds and brokerage firms it alleges are attempting to drive down the value of its stock.[6]

It can be argued that booksellers in particular benefit heavily from the public services their customers' states provide: tax-supported public schools are where most Americans learn to read. In light of the benefits remote sellers receive from public services in their customers' states, at least large remote sellers should collect sales tax from their customers on behalf of the states. And if there is a legal means of achieving this, states are justified in pursuing it.

## How New York's Law Works

The New York law requires many Internet retailers operating "affiliate programs" in the state to charge sales tax on the retailer's sales to New York residents. These affiliates — which can be local bloggers, newspapers, nonprofit organizations, and other types of businesses — post on their websites links to online retailers and receive a commission when purchases are made through those

---

[4] Numerous studies have confirmed that the possibility of avoiding sales taxes motivates some people to make purchases from online sellers. See, for example, Glenn Ellison and Sara Fisher Ellison, "Tax Sensitivity and Home State Preferences in Internet Purchasing," August 2008 (unpublished, http://econ-www.mit.edu/files/3201).

[5] "Overstock.com Drops Internet Affiliate Advertisers in California, Hawaii, North Carolina, and Rhode Island," Overstock.com press release, July 1, 2009. Overstock.com CEO Patrick Byrne also stated: "[P]oliticians have to remember that a tax is the price that government charges for a service, and when they raise their prices, we're going to buy less of their services." "Buy" implies payment, but Overstock.com pays these states nothing for the services it receives; it does not have to pay a corporate income tax in states in which it has customers because of federal Public Law 86-272, nor does it collect sales and use taxes on behalf of such states.

[6] *Overstock.com, Inc. et al. v. Gradient Analytics, Inc. et. al*, California Court of Appeal Case A113397. *Overstock.com, Inc. et al. v. Morgan Stanley & Co., Incorporated et al.*, Superior Court of California, County of San Francisco, Case Number: CGC-07-460147.

3

Ex. 4, Pg. 26

connections. New York's law requires retailers making more than $10,000 in annual sales in the state through New York affiliates to charge New York sales tax on *all* sales in the state, not just those resulting from the affiliate program. The retailer can avoid this obligation, however, if it can demonstrate that its New York-based affiliates do nothing to encourage such sales other than place a link to the retailer on their websites.

The law is a response to the difficulty states have in compelling many out-of-state Internet (and catalog) retailers to collect and remit their sales taxes. Two U.S. Supreme Court decisions have held that states can impose such an obligation only on a retailer with some type of "physical presence" in the state.[7] While that would seem to bar states from requiring retailers with no presence in the state to collect sales taxes, two other Supreme Court decisions clearly establish that an out-of-state seller *is* deemed to have a physical presence in a state if it uses in-state third parties to help "establish and maintain a market" for its goods within the state.[8] New York's law is grounded in these latter decisions.

Many retailers are complying with New York's law. Among them is Amazon.com, but Amazon also has challenged the law in court. The initial trial court upheld the constitutionality of the law in January 2009; Amazon has appealed.

## The Law Helps States Collect Taxes Already Due

Though states lack the legal authority to require *sellers* who do not have a physical presence in the state to charge sales tax, every state requires *purchasers* to remit the tax directly to their state department of revenue. (Technically, the tax is an equivalent "use tax" rather than a sales tax.[9]) A state use tax is always due on an item purchased from an out-of-state Internet or catalog merchant if state sales tax is due on the same item when purchased in a local store.

However, very few consumers fulfill this obligation to self-remit use taxes, and states cannot collect this revenue from individual households cost-effectively unless they can compel the seller to collect it from the purchaser at the time of sale. Courts have long recognized the legitimacy and practical necessity of imposing the collection obligation on sellers if they have a connection or "nexus" with the state. That is what the new law does. It does not impose a new tax. Rather, it simply helps states collect taxes that are already legally due.

---

[7] The more recent of the two decisions is *Quill Corporation* vs. *North Dakota*, 1992.

[8] *Scripto* (1960) and *Tyler Pipe* (1987) establish, respectively, that in-state solicitation of sales by independent contractors and other in-state activities conducted by third parties that are "significantly associated with the [out-of-state] taxpayer's ability to establish and maintain a market in this state for [its] sales" create a tax collection or payment obligation for the out-of-state company. Both decisions were explicitly cited in the 1992 *Quill* decision as examples of the "physical presence" required under the Commerce Clause of the Constitution to obligate an out-of-state company to collect a use tax on behalf of its customers' states. For example, the Court wrote: "Like other bright-line tests, the [physical presence] rule appears artificial at its edges; whether or not a State may compel a vendor to collect a sales or use tax may turn on the presence in the taxing State of a small sales force, plant, or office. Cf. . . . . *Scripto, Inc.* v. *Carson*. . . ."

[9] At least 22 states now include a line on the state personal income tax form to permit the simultaneous payment of the income tax and use taxes.

4

Ex. 4, Pg. 27

For large Internet retailers, at least, a nationwide responsibility to collect and remit sales taxes is not unreasonably burdensome. Many large online merchants already collect sales taxes on behalf of nearly all states; indeed, Amazon calculates and collects sales tax in every state except Vermont on behalf of Target, which sells on Amazon's website.[10] Several companies sell software that substantially automates the process, and other companies enable retailers to outsource the collection process — just as many Internet retailers outsource operation of their affiliate programs.[11]

## Courts Likely to Uphold Law, and States Face Little Risk if They Do Not

Considerable evidence suggests that courts will continue to uphold these affiliate nexus laws as a legal solution to part of the Internet sales tax problem:

- It has long been established that states can require out-of-state sellers to collect sales taxes if they use independent in-state representatives paid on commission to solicit business.[12] While the courts will have to decide whether New York's law as applied is consistent with these decisions — and there is certainly room for debate — the initial trial court decision in New York dismissed Amazon's claim that the law is *inherently* unconstitutional.

- The New York Department of Taxation and Finance is interpreting and enforcing the law in a narrow way that makes it even more likely that higher courts will uphold it. New York is *not* taking the position that the mere presence of a member of an affiliate program in the state obligates the out-of-state retailer to collect and remit New York sales taxes. Rather, the New York affiliates must engage in additional in-state activities aimed at encouraging their readers to buy through the affiliates' links to the retailer (such as targeted mailings).[13]

- The attorney general of Tennessee issued a formal letter opining that Tennessee's proposed (but ultimately not enacted) version of the New York's law, H.B. 1947, was constitutional.[14]

- Finally, two prominent legal scholars have written that courts seem likely to uphold the law as constitutional as applied to at least some factual circumstances. Walter Hellerstein and John

---

[10] http://www.amazon.com/gp/help/customer/display.html?ie=UTF8&nodeId=468512&qid=1245865150&sr=1-1.

[11] Examples of some of these companies may be found at http://www.streamlinedsalestax.org/certified%20service%20provider.htm.

[12] See Note 8.

[13] See: New York State Department of Taxation and Finance, Office of Tax Policy Analysis, Taxpayer Guidance Division, "New Presumption Applicable to Definition of Sales Tax Vendor," May 8, 2008, and "Additional Information on How Sellers May Rebut the New Presumption Applicable to the Definition of Sales Tax Vendor as Described in TSB-M-08(3)S," June 30, 2008.

[14] Opinion No. 09-101, May 28, 2009.

5

Ex. 4, Pg. 28

Swain wrote that there are "plausible factual scenarios under which substantial nexus will exist" in the states in which Internet retailers operate affiliate programs.[15]

The fact that Amazon.com, the nation's largest Internet retailer, decided to comply with New York's law is further evidence of its likely legality. So are the decisions of some retailers to end their affiliate programs in New York, Rhode Island, and other states rather than flout the law (see below).

Even were a state court or the U.S. Supreme Court to overturn a state's law, it is unlikely the state would have to refund any revenue collected in the interim. The decision would only address the issue of whether the companies were obligated to collect the tax. Since any tax that had been collected was, in fact, legally payable by consumers, it is unlikely that courts would order refunds. In fact, in its New York litigation, Amazon.com is not seeking a refund of the taxes it is collecting in the state.

## If Widely Adopted, Law Could Close Significant Part of Internet Sales Tax Gap

Should a large number of states enact and achieve broad compliance with laws dealing with in-state affiliates of Internet retailers, the sales tax revenues collected could make a meaningful dent in the Internet sales tax gap. Affiliate programs are a widespread and critical mechanism by which Internet merchants promote sales. At least 210 of the 250 largest Internet retailers operate affiliate programs.[16] Many of these retailers at present collect sales tax in only a handful of states. Amazon reported having 500,000 affiliates in its "Associates" program in 2000[17] and likely has many more today; accordingly, it likely has many affiliates in every state levying a sales tax.

---

[15] Hellerstein and Swain go on to predict that if a court were to overturn the Amazon law, it would likely do so because of the burden of proof the law places on Internet retailers to demonstrate that their affiliates are not engaged in additional in-state activities beyond placing links on their websites (in which case the law would not apply to them), not because the court determined that the New York affiliate did not effectively constitute physical presence of the retailer in the state.

Notwithstanding their assessment that courts are likely to uphold the legality of the Amazon law as applied in at least some circumstances, Hellerstein and Swain appear to believe personally that the mere presence of an affiliate in a state should not create nexus for the retailer:

Because we doubt that an out-of-state vendor has substantial nexus in New York from posting advertisements on a New York resident's property, resulting in $10,000 of sales to New York customers, we doubt that the digital analogue to such an arrangement *should* create nexus. [Emphasis added.]

As noted in the body of the report, however, New York is not taking the position that the mere presence of the affiliates in the state creates a "substantial nexus" for the retailer. Hellerstein and Swain do not say whether or not they believe that New York's application of the law (as set forth in the two statements of formal guidance it has issued) is constitutional.

See: Walter Hellerstein and John A. Swain, "Challenge to New York Statute Establishing Presumption of Nexus with Online Retailers Who Pay Commissions to State Residents Who Post Links on Their Web Sites," Thomson Reuters State and Local Tax Commentary, March 2009; http://ria.thomsonreuters.com/taxresearch/statelocal/Hellerstein.pdf

[16] *Internet Retailer Top 500 Guide*, 2008 Edition.

[17] "Amazon.com Associates Program Celebrates 500,000 Member Milestone with New-Customer Referral Bonuses," Amazon.com press release, August 3, 2000. Amazon did not disclose how many of those Associates were located in the United States.

Ex 4, Pg. 29

New York tax officials believe that approximately 30 retailers have begun collecting its sales tax because of the new law. The state estimates that these retailers generated $25 million in new state sales tax collections in fiscal year 2009 and predicts that they will generate $33 million in new state revenue in 2010. Local sales tax collections for each year are approximately equivalent to the state collections, meaning that the tax law change is raising well over $100 million over two years.[18] Should New York appellate courts uphold the law, these figures will likely rise. A proposed California version of the law would have generated $150 million annually in combined state and local sales taxes.[19]

## Retailers' Threats to Eliminate Affiliate Programs Are No Reason to Reject Law

A number of Internet retailers responded to the enactment of New York's law by eliminating their relationships with New York affiliates. More recently, Overstock.com (one of the companies that terminated its New York affiliates) and Amazon.com publicly threatened to eliminate their affiliate programs in any other state that enacts such a law. Press reports indicate that one or both companies carried out this threat when similar legislation approached enactment in California, Hawaii, North Carolina, and Rhode Island, and that these terminations remain in place in the latter two states.

While large companies like Amazon and Overstock can eliminate their affiliate programs in a few states to garner publicity and make their threats credible without doing too much damage to their nationwide sales, the ability to do so in a large number of states for a long period of time seems questionable. Amazon pays its Associates sales commissions totaling "hundreds of millions of dollars per year."[20] For the Internet retailing industry as a whole, such commissions totaled $2.1 billion in 2008, according to the Jupiter Research consulting firm.[21] The ubiquity of affiliate programs and the amount of money that retailers spend on them suggest that they are highly valuable to retailers, presumably because they are effective. (The fact that some of these retailers are household names does not mean they don't need strong marketing campaigns; even well-established non-Internet brands like Coke and McDonalds must engage in constant marketing to counter their competitors.) It could be quite costly for Amazon and Overstock to replicate with conventional advertising and other marketing tools the impact of having hundreds of thousands of websites constantly displaying their products and funneling customers to their online stores. Smaller retailers with fewer financial resources would find it even more difficult.

---

[18] Personal communication, New York State Department of Taxation and Finance.

[19] California State Board of Equalization Staff Legislative Bill Analysis for AB 178, 2009.

[20] "Attention Amazon Associates Web Service Developers," post on Amazon.com's in-house blog for Associates, May 8, 2009. Amazon's annual report to the Securities and Exchange Commission for 2008 indicates that the company spent $482 million worldwide on marketing. Assuming that commissions to affiliates are included in that figure, Amazon's statement that it pays "hundreds of millions of dollars" to affiliates implies that such commissions represent a very significant share of its overall marketing expenditures.

[21] "Sales Tax Woe and Social Networking on Affiliate Marketers' Minds," *Internet Retailer* web site, July 2008, www.internetretailer.com/printArticle.asp?id=26904.

Ex. 4, Pg. 30

Some industry analysts argue that it could be unwise for Internet retailers to carry out their threats to end affiliate programs. Bruce Cundiff of Javelin Strategy and Research told *E-Commerce Times*: "Strategically, Amazon is farming more and more of its business to those affiliates. . . . This is very important to Amazon's present and future. . . . For Amazon, at the end of the day, it's cutting off your nose to spite your face."[22] Tom Barlow of the widely read BloggingStocks website wrote: "I suspect Amazon is swimming against an insurmountable tide. If it drops all its marketing affiliates in each state that proposes this tax, it threatens to compromise one of the cornerstones of its marketing program."[23] Rich Duprey of Motley Fool wrote: "Losing affiliates and, therefore, one more avenue to sell its wares was the last thing Overstock needed, because it has had virtually no sales growth over the past three years."[24] Shawn Collins, who writes a well-known blog aimed at members of affiliate programs, warned online retailers:

> I would recommend that you not boot out affiliates living in New York, as some companies have done. This sort of kneejerk reaction may or many not impact purchases from New York customers, but it will definitely have a negative impact on your reputation among affiliates. After all, even if I am not in a state that currently has such a tax, there is always a chance the same sort of legislation could come in the near future. So, if I see you removing affiliates due to this sort of law, I am going to be less inclined to promote you, since I figure I could be kicked out after doing a lot of work to make sales for you. Also, if the New York law catches on elsewhere, as it seems to be doing, we may well be in a situation where most states have a nexus law. In that case, you'll either have a shallow pool of affiliates to partner with or you'll try to re-recruit the same affiliates you alienated in the affected states.[25]

The affiliates and retailers have argued that the new laws are self-defeating: retailers that cancel their affiliate programs will not collect the sales tax anyway, and affiliates' loss of income due to those cancellations has a negative "multiplier effect" on local economic activity, reducing income and sales tax revenue. But Internet retailers that suspend their affiliate programs likely will make fewer sales in those states, and some of the sales they lose will shift back to in-state stores (thereby

---

[22] Mike Pearson, "Amazon Turns Gears of Internet Tax Wars," E-Commerce Times, July 1, 2009; www.ecommercetimes.com/story/Amazon-Turns-Gears-of-Internet-Tax-Wars-67489.html.

[23] Tom Barlow, "Amazon Warns California Against Internet Sales Tax," June 24, 2009; www.bloggingstocks.com/2009/06/24/amazon-warns-california-against-internet-sales-tax/. Conversely, some analysts argue that since affiliate programs are directly responsible for only a fraction of Internet retailers' sales, their elimination would have no significant adverse consequences:

> Dropping affiliates doesn't cause significant financial damage to e-commerce companies. Forrester Research analyst Sucharita Mulpuru estimates affiliates drive between 8% and 20% of the sales for e-commerce sites. But many of those buyers would find their way to online retailers anyway. (Geoffrey A. Fowler and Erica Alini, "States Plot New Path to Tax Online Retailers, Wall Street Journal, July 3, 2009.)

This argument, however, ignores the fact that in an industry with high fixed costs (for example, for marketing, operating warehouses and server farms, and maintaining a website) and relatively low margins on merchandise sales, the incremental 8 percent to 20 percent of sales attributable to an affiliate program may well represent the difference between profitability and unprofitability for certain companies.

[24] Rich Duprey, "These 5 Underdogs Are No Dogs," Motley Fool website, July 16, 2009; http://www.fool.com/investing/general/2009/07/16/these-5-underdogs-are-no-dogs.aspx.

[25] Shawn Collins, "Affiliate Programs and the New York Nexus Law," March 16, 2009; http://affiliatetip.com/news/article002541.php.

Ex. 4, Pg. 31

boosting the local economy) or shift to other Internet retailers that have always collected the state's sales tax or begin doing so under the new law.

Furthermore, state economic development departments in states enacting laws like New York's could help affiliates who are cut off by their retailers to identify compatible affiliate programs run by Internet retailers that *do* collect tax in their states. For example, an affiliate cut off by Amazon could join the affiliate program of IndieBound[26] (a network of the websites of independent local bookstores) or Barnes & Noble (a national Internet bookseller that competes with Amazon and collects sales tax in nearly every state). A website providing links to Amazon's home electronics products could join the affiliate program of Best Buy, which collects sales tax in every state in which it has a store.

As in most conflicts, there is strength in numbers. If a significant number of states enacts and enforces these laws despite threats from Internet retailers, eventually many retailers will likely begin collecting the states' taxes. One way to facilitate such interstate cooperation would be to enact the law as an interstate compact that would not go into effect in any state until a threshold number of states joined.

## Conclusion

In its 1992 *Quill* decision reaffirming a "physical presence requirement" for the collection of sales and use taxes by remote sellers, the Supreme Court essentially invited Congress to intervene in the issue and set reasonable ground rules under which at least some sellers could be required to collect these taxes. Representatives of state and local governments have been petitioning Congress for such action ever since, even as their revenue losses have continued to mount.

Until Congress acts, states should not allow their tax bases to be eroded and the competitiveness of their local businesses harmed if they can effectively and legally address part of the problem themselves. They now have an important self-help strategy for that effort.

---

[26] See: Kristen McLean, "An Alternative for Ex-Amazon Affiliates," June 30, 2009; http://news.shelf-awareness.com/msgget.jsp?mid=2935145.

Ex. 4, Pg. 32

# EXHIBIT 5

Ex. 5, Pg. 33

The New York Times



PRINTER-FRIENDLY FORMAT
SPONSORED BY

CAREY
MULLIGAN

May 7, 2010

EDITORIAL

# Amazon and Sales Tax

Amazon.com is in court again, fighting what ought to be a losing battle to defend its longstanding practice of not collecting sales taxes in most states where it does business.

In the latest case, reported recently by The Times's Noam Cohen, the company's roundabout argument is that it and its customers have a First Amendment right to tax avoidance.

To help you wrap your head around that one, here's some background:

A 1992 Supreme Court ruling holds that a retailer must collect sales tax only if it has a physical presence in the customer's state. So a bricks-and-mortar retailer that also operates online, like Target or Macy's, will collect sales taxes. Similarly, if you go through Amazon.com to buy something from, say, Target, Amazon will collect taxes from you on Target's behalf. But Amazon and some other purely online retailers do not generally collect taxes on their own sales.

That tax is legally due, but if online retailers don't collect it, it's up to the individual buyer to voluntarily pay the tax, which rarely happens and is very difficult for states to enforce.

Enter North Carolina. Unable to get Amazon.com to collect the taxes, the state recently began an audit of online businesses, trying to track down what it assumes are millions of dollars in uncollected taxes. The state has told Amazon that it wants buyers' names and the amounts they spent. That state also needs to know the general categories of spending, like books or movies or food, because some items are tax exempt. Amazon has refused to comply, claiming in federal court that North Carolina may be able to learn the titles of books and movies that its customers have bought, imperiling privacy and free speech. North Carolina officials have said they are not seeking those details. Now it is up to the court to decide whether Amazon will have to reveal the names of customers, without titles.

This case is not really about privacy and free speech. It's about how far Amazon is willing to go to protect a business model that relies on not collecting sales tax. Noncollection gives

Ex. 5 , Pg. 34

Amazon a major unfair advantage over rival retailers that do collect sales tax and deprives hard-pressed states of much-needed revenue.

Which raises the bigger issue. Congress has been negligent in not changing the law to require sales tax collection by online retailers but is being lobbied by many states to reform the rules. New York has taken matters into its own hands. The Legislature passed a smart law in 2008, requiring online retailers to collect sales taxes from New York customers. Amazon challenged the law in court, lost and appealed. The appeals court is expected to rule soon. If successful, the New York law could serve as a model for other states.

One way or another, it seems inevitable all online retailers will collect sales taxes. The only question is when.

Copyright 2010 The New York Times Company

Privacy Policy | Terms of Service | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Ma

Ex. 5, Pg. 35

# EXHIBIT 6

Ex. 6, Pg. 36



# Amazon.com: Fighting for Free Speech? Or Against Sales Tax?

## Amazon.com Sues North Carolina to Protect Customer Privacy but Critics See an Ulterior Motive: Avoiding State Sales Taxes

**By ALICE GOMSTYN**
**ABC NEWS Business Unit**

**May 11, 2010 —**

If you purchased a book called "Living With Alcoholism," would you want the government to know? How about "Outing Yourself: How to Come Out as Lesbian or Gay to Your Family, Friends, and Coworkers"? Or "Bipolar Disorder: A Guide for Patients and Families"?

In a lawsuit, Amazon.com, the online retailer, argues that such potentially sensitive information and more could be disclosed to North Carolina state officials if the state succeeds in its demand that Amazon turn over customer purchase records to state tax officials.

The retailer says that the demand is a violation of its customers' free speech and privacy rights, and its lawsuit has drawn the support of the American Civil Liberties Union.

North Carolina's Department of Revenue rebuts Amazon's claim, saying in a written statement that its requests to Amazon do not actually require the retailer to disclose book titles.

While the case may provide new fodder for debate for First Amendment scholars, not everyone is so sure that Amazon is being genuine in its free speech fight. Critics allege that the lawsuit is part of Amazon's broader campaign to avoid charging its customers state sales tax.

"Amazon is trying to distract attention from its lack of sales tax compliance and its aggressive efforts to avoid collecting tax by whipping up consumer concern about privacy violations where there's really no legitimate concern," said Michael Mazerov, a senior fellow at the Center for Budget and Policy Priorities, a Washington, D.C.-based think tank.

### Amazon.com Fights Sales Taxes

As established by a 1992 Supreme Court ruling, retailers with no physical presence in a state cannot be forced to collect state sales tax.

Since then, experts say, states have been battling to find ways to mandate that online retailers like Amazon still collect sales tax. There have been efforts to change the system both in Congress -- legislation that has languished in Congress in the past may be reintroduced this year -- and by state legislatures.

Ex. 6, Pg. 37

In recent years, retailers' affiliate programs -- consisting of in-state companies that collect commissions by referring customers to online retailers like Amazon -- have proven critical to state efforts.

North Carolina, Rhode Island and New York have all passed laws stipulating that online retailers' affiliate programs in their states qualify as physical presence and therefore, the states can force them to collect sales tax.

"This is really an issue of fairness and equity for small businesses, the brick and mortar, corner-store operations," North Carolina Secretary of Revenue Kenneth R. Law, who is named as the defendant in Amazon's lawsuit, said in a recent statement about the retailer. "These businesses are at a competitive disadvantage when they have to collect sales taxes that other businesses do not."

Amazon pushed back against the laws, ending its affiliate programs in North Carolina and Rhode Island. In New York, meanwhile, Amazon.com and fellow online retailer Overstock.com each sued to stop the state from forcing them to collect sales taxes after the state changed its tax law. Both companies argued that the law was unconstitutional. A judge dismissed both cases; Amazon.com and Overstock.com now have appeals pending.

Most recently, Colorado enacted a law requiring online retailers provide the state with information on their sales to Colorado customers and to notify their customers that their purchases could eventually be subject to state sales tax. Experts say that Colorado's law differs from those of New York and the others because it would be up to the state, not the retailer, to ultimately collect the sales taxes.

Amazon has also fought back against the Colorado law, ending its affiliate programs as it did in North Carolina and Rhode Island. But Amazon rejects assertions that the company is against charging sales taxes altogether.

The company said in a written statement that it's not opposed to "collecting sales tax within a constitutionally-permissible system applied even-handedly."

Amazon does collect sales tax in five states and that it does "a thriving business in these states," the company said.

## Benefits of No Sales Tax

Critics argue that, generally, avoiding charging the sales taxes levied by its brick-and-mortar rivals is key to the success of Amazon.com and other online retailers.

Overstock.com general counsel Mark Griffin doesn't disagree.

Griffin said that his company has, indeed, kept its physical footprint small -- that is, limited its physical presence in various states -- "to avoid becoming tax collectors for states."

Griffin said it's unfair to compare companies like Overstock or Amazon to brick-and-mortar businesses because online retailers don't consume the same amount of resources -- think real estate or water, for instance -- as their rivals do.

"We chose our businesss model, they chose theirs," he said. "Now they want to change the ground rules."

Ex. 6, Pg. 38

Joseph Henchman, tax counsel and director of state projects for the Tax Foundation, said that forcing online retailers to collect state sales taxes won't level the playing field between them and brick-and-mortar stores.

Brick-and-mortar stores, he said, often have to concern themselves with only one taxing jurisdiction. But national online retailers face many more.

"There are over 8,000 sales taxing jurisdictions in the United States," he said. It's up to online retailers to sort the different rules of the jurisdictions, he said, and if they get it wrong, they could face "enormous liability."

**Amazon.com's First Amendment Argument**

After Amazon cut ties with its North Carolina affiliates, the state didn't give up. Last year, the state began an audit of Amazon's sales to North Carolina residents.

In a recent statement, the North Carolina Department of Revenue said that it "routinely requests third party, or consumer information, in order to identify and collect any taxes due the state."

Mazerov said that the information collected from Amazon could allow North Carolina to solicit sales taxes directly from Amazon customers, just as Colorado is attempting to do under its new law.

## Amazon Gets Support From ACLU

"Certainly, Colorado is not likely to come after someone if bought $5 book or $10 book for 40 cents of taxes," Mazerov said. "But a $2,000 flat-screen TV or laptop computer -- that may be worth it for the state."

Back in North Carolina, Amazon.com said that it has already provided the state with "voluminous information" about its North Carolina sales, including information on pricing and item descriptions for each transaction.

But the retailer argues that state officials should not be privy to information on which customers have purchased what items.

"The First Amendment protects the rights to distribute, sell, purchase and receive lawful expressive materials free from government scrutiny," the company said in its lawsuit, filed last month.

The state, meanwhile, has argued that Amazon's complaint is misleading and that the state is not actually seeking the level of detail that Amazon asserts.

"We are not looking for details of transactions. The only thing we need is data that helps us administer and collect the taxes legally due to the state of North Carolina," Lay said in an e-mailed statement to ABCNews.com.

Asked about Lay's comments, ACLU attorney Aiden Fine said the group still supports Amazon.

"What's important here is that the state of North Carolina has already received detailed product information about what North Carolina customers have purchased, and forcing Amazon to provide specific user information would violate the constitutional rights of those customers," Fine said. "The

Ex. 6, Pg. 39

Case 2:10-cv-00664-MJP   Document 56-2   Filed 08/06/10   Page 37 of 39

state should not attempt to force Amazon to provide that information."

Copyright © 2010 ABC News Internet Ventures

Ex. 6, Pg. 40

# EXHIBIT 7

Ex. 7, Pg. 41

# The Seattle Times

Wednesday, April 21, 2010 - Page updated at 06:31 PM

*Permission to reprint or copy this article or photo, other than personal use, must be obtained from The Seattle Times. Call 206-464-3113 or e-mail resale@seattletimes.com with your request.*

## Tar Heel State right to challenge Amazon.com on sales tax

IN Amazon.com's fight with North Carolina, this page sides with North Carolina.

The Tar Heel State says its residents ought to pay the same sales tax if they buy from Amazon or the corner bookshop in Winston-Salem. It calls this matter "an issue of fairness and equity for small businesses, the brick and mortar, corner-store operations."

We agree. Local retailing has long been put at an artificial disadvantage. This is particularly true of retailers of books, Amazon's original market.

Internet retailing has grown up. It no longer needs a tax loophole in order to compete, if it ever did, and its tax status is inherently unfair.

When mail order was a relatively small industry, the tax leakage did not matter much. But it is small no more.

Amazon says that between Aug. 1, 2003, and Feb. 28, 2010, it sold more than 50 million products to customers in North Carolina. If that figure grabbed the attention of the tax collectors in North Carolina, it is no surprise. Its tax department made a request, and Amazon supplied it with figures for gross sales by ZIP code.

What the company has not done, and what North Carolina wants it to do, is to provide buyers' names and the amounts they bought.

To block this, Amazon has gone to federal court in Seattle. There, the company is waving its arms about the First Amendment, saying North Carolina is asking for the titles of the books and DVDs its citizens bought, and that this is not a governmental concern.

If a state were asking for that, the company would be right. But the Tar Heel State does not want to know the names of books and DVDs its residents are buying. It wants to know what taxes they are not paying.

This is not a First Amendment issue. The First Amendment does not make books and movies tax-free.

Here is some advice for Amazon. You are going to lose this fight. Maybe you will win in this courtroom and maybe you will not, but you are going to lose in Congress. There is no way Internet retailing can continue without payment of state taxes.

Already there is an effort of more than 22 states to lobby Congress to create a federal law about this. They ought to prevail, and they will. Accept it now, and get on with business.

Copyright © The Seattle Times Company

Ex. 7, Pg. 42